UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JUDITH S. DYER,                          )
                                         )
              Plaintiff,                 )
                                         )
    vs.                                  )        No. 4:09CV01354 AGF
                                         )
COMMISSIONER OF SOCIAL SECURITY,         )
MICHAEL J. ASTRUE,                       )
                                         )
              Defendant.                 )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Judith S. Dyer was not disabled

and, thus, not entitled to either supplemental security income under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f, or disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§401-434.  For the reasons set forth below, the

decision of the Commissioner shall be reversed and the case remanded for further

consideration.

Plaintiff, who was born on February 4, 1963, filed for benefits on May 11, 2006,

at the age of 43, alleging a disability onset date of March 25, 2006, due to fibromyalgia

and depression.  After Plaintiff's application was denied at the initial administrative level,

she requested a hearing before an Administrative Law Judge ("ALJ") and such hearing

was held on June 24, 2008.  By decision dated July 14, 2008, the ALJ found that Plaintiff

had the residual functional capacity ("RFC") to perform her past relevant clerical work.

Plaintiff requested review by the Appeals Council of the Social Security Administration

and submitted new evidence – a mental RFC assessment by Plaintiff's treating

psychiatrist, Georgia Jones, M.D. On June 25, 2009, the Appeals Council denied the

request for review. Plaintiff has thus exhausted all administrative remedies and the

Commissioner's decision stands as the final agency action now under review.

Plaintiff argues that the Commissioner's decision is not supported by substantial

evidence. Specifically, Plaintiff argues that (1) the ALJ's assessment of Plaintiff's

physical RFC was not consistent with the medical evidence, (2) the ALJ improperly

discounted the opinion of one of Plaintiff's treating physicians, James Turner, M.D., (3)

the ALJ's evaluation of Plaintiff's credibility was flawed, and (4) the Appeals Council

failed to give proper weight to the mental RFC assessment submitted by Dr. Jones.[1]

Plaintiff asks the Court to reverse the Commissioner's decision and remand the case for

an award of benefits, or alternatively, for reconsideration.

## BACKGROUND

**Work History and Application Forms**   (Tr. 86-129.)

Plaintiff reported on her application form that she worked as an Emergency

Medical Technician ("EMT") from 1996 to 2000, earning $60 per day; as a general office

---

[1]     In her complaint, Plaintiff stated that the ALJ should have recused himself
from the proceedings in order to avoid the appearance of bias following a complaint filed
against the ALJ (on July 3, 2008), by the attorney who represented Plaintiff in the
administrative proceedings. Compl. ¶ 19. This claim was presented to the Appeal
Council (Tr. 82-84), which rejected it. The claim is not presented in Plaintiff's brief or
reply brief. Upon review of the record, this Court rejects the claim.

clerk "on and off" from 1990 to 2002, earning $10 per hour; as a veterinary assistant from 1994-1997, earning $8 per hour; and as an "excavator" (laborer/driver for an excavation company) from 2002-3/2006, earning $15 per hour. All of these jobs were part time, except for the office work. (Tr. 114.) Earnings records show earnings from 1979 through 2004, except for 1984 and 2003. Plaintiff's earnings ranged from a low of approximately $1,400 in 1979 to a high of approximately $28,800 in 1998. (Tr. 104.)

On forms submitted with her application for benefits, Plaintiff represented that her impairments first began to bother her in January 2005, but that she continued to work, reducing her hours, until March 25, 2006 (when she was working for the excavation company), when she felt that it was no longer safe for her to work. (Tr. 113.)

In a statement dated June 24, 2008, Plaintiff described the development of her impairments, starting with losing balance in her right ear; then experiencing chronic fatigue, back pain, headaches, and dizziness. When her doctor was unable to determine the cause of her problems, she became depressed, but still she was determined to "push [herself] through" the problems. Then beginning in 2006, she experienced episodes of symptoms similar to those of a stroke. Plaintiff wrote that she learned to manage some of her symptoms through exercise, diet, and sleep, but still had about five days a month that were "unbearable," with breakthrough pain. She stated that she was taking Lyrica for pain, Zoloft, Aripiprazole (Abilify), Amitriptyline (Elavil), and Ambien for depression and sleep; and Darvacet for breakthrough pain. Plaintiff stated that the side effects of these medications included feeling jittery or shaky, having memory problems, and

3

numbness, but that these were preferable to the pain.  (Tr. 130.)

**Medical Record**

 On March 2, 2005, Plaintiff was admitted to the hospital due to dizziness and right ear pain.  A video electronystagmography ("ENG") conducted on that date indicated that Plaintiff had benign paroxysmal positional vertigo ("BPPV").[2]  Follow-up with an Ear Nose and Throat ("ENT") physician, and rehabilitation were recommended.  (Tr. 133-50.)

Between September 12, 2005, and August 30, 2006, Plaintiff was treated at a chiropractic clinic 13 times for back and neck pain.  During that time, Plaintiff cancelled three appointments because she was feeling good, including her final appointment scheduled for August 30, 2006, stating that "she is feeling great with no spasms" and would call when she needed treatment again.  She also missed one appointment for an unknown reason.  (Tr. 172-76.)

On April 21, 2006, Plaintiff visited the emergency room ("ER") with complaints of dizziness and lightheadedness, which she had been experiencing for a number of days.  She stated that she had been unable to walk properly, that at one point, she had trouble speaking, and that she felt some tingling in her left arm that radiated to her jaw.  Plaintiff

----

[2]    BPPV is caused by an inner ear problem that generally causes sudden, recurring spells of vertigo, severe enough to cause nausea and vomiting, and that can result in difficulty standing or walking without falling down.  BPPV generally goes away within a few weeks on its own, but can come back.  It is not a sign of a serious health problem http://www.webmd.com/brain/electronystagmogram-eng (last visited June 10, 2010).

was diagnosed with BPPV and possible transient ischemic attack. She was treated with medication and released a few hours later after the problem resolved. (Tr. 152-53.)

On July 25, 2006, state disability examiner Lisa Buhr completed a Physical RFC assessment, on which she indicated that Plaintiff could lift and/or carry no more than 50 pounds occasionally and no more than 25 pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; push and/or pull without limitation; occasionally climb ramps and stairs; and kneel, crouch, crawl, and stoop. Ms. Buhr indicated that Plaintiff could never balance or climb ladders, and that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations, except that she should avoid concentrated exposure to hazards such as heights and machinery. Ms. Buhr stated that Plaintiff's allegations of "a lot of" dizziness and frequent loss of balance were not supported by the medical evidence, and were only partially credible. (Tr. 164-69.)

On September 5, 2006, Plaintiff saw Dr. Turner, with a variety of "somatic complaints" and generalized aches and pains. Plaintiff told Dr. Turner that she thought she might have fibromyalgia,[3] did not find anti-inflammatory medications helpful, and had stopped taking Cymbalta because she did not believe she was depressed and Cymbalta made her "feel funny." Dr. Turner prescribed Amitriptyline to replace

---

[3] Fibromyalgia is characterized by "chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of the affected muscles." Stedman's Medical Dictionary 725 (28th ed. 2006).

Cymbalta; the next day, upon Plaintiff's request, he also prescribed Zoloft. (Tr. 188.)

On September 22, 2006, Plaintiff followed up with Dr. Turner, who referred her to Dr.

Jones for a neuropsychiatric evaluation, noting that Plaintiff might have fibromyalgia.

(Tr. 186.)

On November 3, 2006, Plaintiff visited Dr. Jones and reported various problems

including chronic pain, dizziness, and stress. On mental status examination, Dr. Jones

noted that Plaintiff appeared agitated, had a blunted affect, and was in a depressed and

anxious mood. Plaintiff's memory and concentration were fair, her judgment was

average, and her intellectual functioning was above average. Dr. Jones diagnosed

moderate major depressive disorder, inner ear issues, fibromyalgia, and a global

assessment of functioning score ("GAF") of 50.[4] She prescribed an increase in Zoloft,

continued Amitriptyline, and scheduled follow-up treatment. (Tr. 181-84.) On

November 20, 2006, and again in February, 2007 Plaintiff returned to Dr. Jones for

follow-up visits; on both occasions Dr. Jones continued Plaintiff's Zoloft and

Amitriptyline. (Tr. 179-80.)

On April 6, 2007, Plaintiff saw Dr. Turner, who assessed "fairly classic

_____

[4] A GAF score represents a clinician's judgment of an individual's overall
ability to function in social, school, or occupational settings, not including impairments
due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment
in reality testing or communication or "major" impairment in social, occupational, or
school functioning; scores of 41-50 reflect "serious" impairment in these functional areas;
scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild"
impairment.

fibromyalgia," and noted that Plaintiff was "doing substantially better" and felt that she had done "incredibly well" on Zoloft. Plaintiff, however, complained of continued discomfort and sleep disturbance, for which Dr. Turner prescribed Lunesta. (Tr. 186.) On April 19, 2007, Plaintiff called Dr. Jones and told her that she was only taking half of her Zoloft. (Tr. 179.)

In a letter dated April 23, 2007, Dr. Turner wrote "To Whom it May Concern" that Plaintiff suffered from "substantial difficulties with fibromyalgia," which produced persistent muscle pain, debility, and stiffness, as well as sleep disturbance. He further wrote that although Plaintiff had been helped somewhat by treatment, he did not believe she was capable of doing "any work which involve[d] physical exertion" and that it would be a "practical impossibility" for her to sit in a single position for an extended period of time. Dr. Turner stated that the "long term prognosis is for periods of exacerbation making long term employment difficult, if not impossible." (Tr. 187.)

Plaintiff saw Dr. Jones on May 10, 2007, and reported that her mood was affected by her pain. Dr. Jones again continued Zoloft and Amitriptyline. (Tr. 178.) On July 3, 2007, Plaintiff told Dr. Turner that despite taking Lunesta, she had not slept in three days, which worsened her fibromyalgia. Dr. Turner replaced Lunesta with Ambien. (Tr. 186.) On August 13, 2007, Plaintiff saw Dr. Jones, who concurred with Dr. Turner's prescription of Ambien. (Tr. 209.) On September 20, 2007, Plaintiff called Dr. Turner's office requesting pain medication and was advised to take Aleve and increase Amitriptyline. (Tr. 217.)

On September 26, 2007, Plaintiff saw Susan Burkhart, M.D., at a community health clinic, requesting pain medication for breakthrough pain due to her fibromyalgia. Plaintiff stated that although her fibromyalgia was "pretty well managed" with Amitripryline, Zoloft, and Ambien, she still had cycles of increased pain and stiffness. Plaintiff was prescribed Tramadol, and advised to follow up in two weeks.  On October 10, 2007, Plaintiff complained that the Tramadol was ineffective; Dr. Burkhart assessed fibromyalgia and chronic fatigue, and prescribed Lyrica (newly approved by the FDA). On October 22, 2007, Dr. Burkhart increased the dosage at Plaintiff's request, and on November 5, 2007, Plaintiff told Dr. Burkart that she "had remarkable results" with Lyrica, and almost no pain.  Lyrica was continued, as were Elavil and Sertraline (Zoloft). (Tr. 190-99.)

On November 9, 2007, Plaintiff was seen by Chokkalingam Siva, M.D., for a rheumatology consult.  Dr. Siva found Plaintiff's range of motion and muscle strength to be normal in all joints and extremities, with no joint inflamation or effusion.  He also noted that Plaintiff had diffuse myofascial pain, and observed that Plaintiff was alert and reactive.  (Tr. 201-04.)

On November 12, 2007, Dr. Jones continued Plaintiff's Amitriptyline, Zoloft, and Ambien.  (Tr. 208.)  On January 7, 2008, Dr. Burkhart gave Plaintiff a Toradol injection, told her that she could increase her Lyrica dosage on bad days, and recommended Tylenol and exercising and stretching.  (Tr. 211-12.)  On February 6, 2008, Dr. Turner continued Plaintiff's anti-depressant and fibromyalgia medications (Sertraline, Lyrica,

8

Amitriptyline, Ambien, and Tramadol) and noted Plaintiff's comment that "Lyrica has been a miracle drug" and that she was "doing much better." Dr. Turner gave Plaintiff Darvocet to try instead of Tramadol. (Tr. 216.)

On February 18, 2008, Plaintiff reported to Dr. Turner a "seizure-like" episode in which she felt a tingling in her hands and feet, with swelling and reduced sensation, followed by body aches and nausea. Dr. Turner noted that Plaintiff did not show any sensory deficit on her hands or arms. He did not discern a cause for the temporary paresthesias, noting that it did not appear to be vascular. (Tr. 215.)

On March 20, 2008, Plaintiff followed up with Dr. Jones, who observed that Plaintiff was alert and oriented, with appropriate behavior, coherent speech, linear and logical thought processes, and fair insight and judgment. Dr. Jones continued Plaintiff on Zoloft, Amitriptyline, and Ambien. (Tr. 219.)

**Evidentiary Hearing of June 24, 2008** (Tr. 16-35.)

Plaintiff, who was represented by counsel, testified that she was 45 years old and had attended college for four to five years but had never earned a degree. Her main work in the past was office clerical and administrative assistant work. In one such position, which she had held for three years, she would lift as much as 70 pounds, citing as an example, restocking file cabinets. She also noted her several part-time jobs as an EMT, excavation worker, and veterinary assistant.

Plaintiff testified that fibromyalgia was the primary problem that kept her from working. She stated that she had good days and bad days, but that pain was always

present. She described the pain on her best days as "feeling like moderate arthritis," and stated that on her worst days she could not get out of bed. She took medication for the condition, some of which made her dizzy. Plaintiff testified that Dr. Jones had helped her "quite a bit" and that she had seen Dr. Jones on the day prior to the hearing, and therefore twice in 2008. She stated that she no longer had health insurance.

Plaintiff testified that she had trouble with her balance, which she believed was connected to the right ear problem she had in 2005. She stated that the ENT physician she saw for the problem informed her that she would not regain her balance, but that her brain would learn to adapt by using other senses. Plaintiff stated that her balance improved, but that she never regained all her balance, and that when the problem subsequently returned, she reported it to Dr. Turner. She also went back to the ENT physician who informed her that she was fine.

In response to questions by her counsel, Plaintiff testified that the fibromyalgia affected her entire body. She testified that on a normal day, the pain was constant and on bad days it felt "like it's deep in my bones." Plaintiff testified that although she still felt pain, Lyrica had allowed her to get out of bed and gave her back her mobility.

She testified that she believed that there was power in words, and that if she said she felt good, then she would actually feel better, which was why at times she told her doctors that she felt good. Since she started taking Lyrica, she only had about five bad days a month when she was unable to do anything other than lie in bed, and generally eight to ten "really good days" when she only had moderate pain. Whereas before

Lyrica, she only had about five good days a month. She always felt fatigued and at times her medications worsened her fatigue, as well as her balance.

Plaintiff stated that her normal morning routine was to make a pot of coffee and sit outside on her porch. She still got headaches, but they had been far worse before she began taking Lyrica. Plaintiff testified that she believed Zoloft helped improve her depression and maintain emotional balance, and that if she did not think or talk about being depressed, she felt "okay." On her "better days," she accomplished things by setting small goals and by learning to be happy if she achieved them. She further testified that because of her neck pain, chores that required her to look down were the hardest.

The VE was asked to consider a hypothetical individual of the same age, education, and past work experience as Plaintiff, with the ability to lift and carry up to 20 pounds occasionally and ten pounds frequently; stand, walk, and sit, each for six out of eight hours; and occasionally climb stairs and ramps. The VE testified that such an individual could perform Plaintiff's past office clerk and administrative assistant jobs, other than the one that involved lifting 70 pounds. Upon further questioning by the ALJ, the VE testified that if the individual could only understand, remember, and carry out simple instructions and perform non-detailed tasks, the individual would not be able to perform those jobs.

The VE testified that if these psychological limitations were eliminated, but the individual could only lift up to ten pounds occasionally and less than ten pounds frequently, stand or walk for only two hours out of eight, and sit for six hours out of

eight, the individual could still perform the office clerk and administrative assistant jobs. If the earlier psychological restrictions were added, these jobs would, once again, cease to be viable employment options, and the only viable employment would be entry level sedentary work, such as small product assembly type jobs, of which there were significant numbers in the local economy. The VE testified that an individual who was not able to show up at work five days per month, would not be employable.

**Post-Hearing Evidence**

In a letter to Plaintiff's counsel dated June 30, 2008, Dr. Turner wrote that he did not specifically evaluate Plaintiff's physical limitations with regard to lifting, walking, or sitting, but that Plaintiff had "severe fibromyalgia with lancinating pains, is very stiff, and has difficulty simply carrying on her activities of daily living." Dr. Turner opined that Plaintiff could "certainly" not perform her prior heavy manual work and that sitting at a desk doing clerical work "would be incredibly painful and difficult" for her. (Tr. 220-21.)

**ALJ's Decision of July 14, 2008**  (Tr. 8-15.)

The ALJ concluded that Plaintiff met the insured status requirements for disability benefits through September 30, 2008, and that she had not engaged in substantial gainful activity since March 25, 2006, the alleged disability onset date. The ALJ summarized the medical records and determined that Plaintiff's fibromyalgia was a "severe" impairment, but that Plaintiff did not have an impairment or a combination of impairments that qualified as a deemed-disabling impairment listed in the Commissioner's regulations.

The ALJ then determined that Plaintiff had the physical RFC to perform sedentary work,[5] that was limited to only occasionally climbing stairs and not working at heights. The ALJ summarized Plaintiff's testimony and stated that her condition was "greatly improved with medication." He referenced Plaintiff's statement that Lyrica was a "miracle drug," and stated that if a medical condition could be controlled by medication, it was not considered disabling. The ALJ stated that Plaintiff "made no effort to try and do less demanding work. She basically declared herself disabled, and quit."

The ALJ commented that because no psychiatric RFC assessment had been submitted, he could only draw the negative inference that such would have been of no benefit to Plaintiff. The ALJ discounted Dr. Turner's April 23, 2007 statement that Plaintiff could not work, because it had "no basis," and was written before Plaintiff began taking Lyrica. The ALJ stated that although Dr. Turner repeated his opinion in his letter dated June 30, 2008, the ALJ placed "little weight" on Dr. Turner's "suspicions." The ALJ stated that as Dr. Turner was not qualified to draw legal and vocational conclusions, which were reserved to the ALJ, Dr. Turner's conclusions, with regard to the determination of disability, were "not dispositive."

The ALJ determined that Plaintiff's depression was not disabling because there

_____

[5] Sedentary work involves lifting no more than ten pounds at a time; and walking and standing for no more than two hours, and sitting for about six hours, in an eight-hour workday. 20 C.F.R. § 404.1567(a); Social Security Ruling 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

was no evidence of marked restriction of daily activities, constriction of interests, deterioration of personal habits, or an impaired ability to relate. The ALJ noted that Plaintiff had told Dr. Turner (on April 6, 2007) that she was doing better on Zoloft. He then stated that she saw Dr. Jones only six more times over the ensuing 18 months, and that her "testimony was consistent that the depression is much improved."

The ALJ pointed to Ms. Buhr's July 25, 2006 physical RFC assessment, in which Ms. Buhr concluded that Plaintiff had the physical capacity to perform at the medium work level. Based upon the VE's testimony, the ALJ determined that Plaintiff was capable of performing her past relevant work as an administrative assistant or office clerk, as actually and generally performed, and that, therefore, Plaintiff was not disabled.

**New Evidence Submitted to the Appeals Council**

On June 23, 2008,[6] Dr. Jones completed a Medical Assessment of Ability to Do Work Related Activities (Mental). Dr. Jones determined that Plaintiff would be able to make good occupational adjustments, but would only have a fair ability to relate to co-workers, interact with supervisors, or maintain attention or concentration; and a poor to no ability to deal with the public or work stressors, to function independently, or to maintain attention or concentration. Dr. Jones also noted short term memory issues, poor energy, crying spells, irritability, and chronic pain. She indicated that Plaintiff would be

---

[6]  In the request for review, Plaintiff's counsel stated that although Dr. Jones signed the mental assessment on June 23, 2008, counsel did not receive it until August 7, 2008. (Tr. 82.)

unable to understand, remember, and carry out complex or detailed job instructions;
would have a fair ability to understand, remember, and carry out simple job instructions
and to maintain personal appearance; and a poor, if any, ability to behave in an
emotionally stable manner, relate predictably in social situations, and demonstrate
reliability. Dr. Jones indicated that Plaintiff would have the capacity to manage benefits
in her own best interest. (Tr. 222-23.)

**Appeals Council Proceedings**

As noted above, on June 25, 2009, the Appeals Council denied Plaintiff's request
for review of the ALJ's decision. The Council stated that the additional evidence did not
"provide a basis for changing the [ALJ]'s decision." (Tr. 1-4.)

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm
the Commissioner's decision so long as it "'complies with the relevant legal requirements
and is supported by substantial evidence in the record as a whole.'" Pate-Fires v. Astrue,
564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir.
2008)). "Substantial evidence is less than a preponderance, but is enough that a
reasonable mind would find it adequate to support the Commissioner's conclusion." Id.
(citation omitted). In reviewing the record, the court "must consider both evidence that
supports and evidence that detracts from the Commissioner's decision." Id. Reversal is
not warranted, however, "so long as the ALJ's decision falls within the 'available zone of

choice.'"  <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (2008) (citation omitted).

The decision of the ALJ is not outside the "zone of choice" simply because a reviewing court might have reached a different conclusion had it been the initial trier of fact.  <u>Id.</u>  Rather, "if after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  <u>Owen v. Astrue</u>, 551 F.3d 792, 798 (8th Cir. 2008) (citation omitted).

In addition, when, as here, the Appeals Council has considered new and material evidence and declined review, the reviewing court "'must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence.'"  <u>Gartman v. Apfel</u>, 220 F.3d 918, 922 (8th Cir. 2000) (quoting <u>Kitts v. Apfel</u>, 204 F.3d 785, 786 (8th Cir. 2000)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Barnhart v. Walton</u>,  535 U.S. 212, 217-22 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether claimant has a "severe" impairment or combination of impairments.

A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disability impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any. If the claimant can return to past relevant work, the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform other jobs that exist in significant numbers in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

**Assessment of Plaintiff's RFC**

Plaintiff contends that the Commissioner's assessment of her RFC is not supported by substantial medical evidence in the record. As noted above, she argues that in determining Plaintiff's RFC, the ALJ improperly discounted Dr. Turner's opinions and

17

Plaintiff's testimony. She further argues that the Appeals Council failed to give proper weight to the June 23, 2008 mental assessment prepared by Dr. Jones.

A disability claimant's RFC is the most he can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), <u>abrogated on other grounds by</u> 524 U.S. 266 (1998), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Id.</u> at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." <u>Cox v. Astrue</u>, 495 F.3d 614, 619 (8th Cir. 2007) (citing <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001)). The absence, however, of an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized

clarity to allow for an understanding of how those limitations function in a work environment." Id. at 620, n.6.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2).

An ALJ, however, may "discount or even disregard the opinion of a treating physician where other medical assessments are 'supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted).

Here, no medical source opined that Plaintiff could sit for six hours in an eight-hour workday -- one of the requirements for the performance of Plaintiff's past office jobs. Nor does the Court find evidence in the record from which the ALJ could have ascertained that Plaintiff had that ability. As noted above, Dr. Turner specifically stated in his letter of June 30, 2008, that Plaintiff would essentially be unable to sit for that long in a workday. The ALJ characterized Dr. Turner's opinions as "suspicions," and

19

discounted them on the ground that they invaded the province of the ALJ.

It is true, as the ALJ stated, that statements by a medical source that a claimant is disabled or cannot be gainfully employed get no deference because they invade the province of the Commissioner to make the ultimate disability determination.  See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).  But Dr. Turner's statement that sitting at a desk doing clerical work could be "incredibly painful and difficult" for Plaintiff, was a medical opinion and not a vocational opinion or a statement interpreting the statute.

The Court finds no basis for discounting Dr. Turner's opinions.  The Court notes that fibromyalgia has long been recognized by the courts as an elusive diagnosis; its "cause or causes are unknown, there's no cure, and, of greatest importance to disability law, it's symptoms are entirely subjective."  Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) (citation omitted); see also Waters v. Astrue, No. 2:09CV28 DDN, 2010 WL 2522702, at *9-10 (E.D. Mo. June 16, 2010) (reversing and remanding where the ALJ appeared to have given no substantial consideration to the potentially disabling effects of fibromyalgia, improperly dismissing the disease for lack of objective evidence).

To the extent that the ALJ relied upon the physical RFC findings of Ms. Buhr, this was inappropriate as Ms. Buhr was not a medical source, and further, her opinions were based entirely on the ER notes from Plaintiff's April 2006 visit.  Thus, even if the ALJ was entitled to discredit Dr. Turner's opinions, the record is devoid of medical evidence supporting the ALJ's RFC determination.

A similar problem presents itself with respect to Plaintiff's mental abilities.  The

ALJ did not include any mental restrictions in his RFC determination.  This may be

explained by the fact that the ALJ did not have before him a mental assessment of

Plaintiff by any medical source.  But the Appeals Council had Dr. Jones's June 23, 2008

mental assessment.  Dr. Jones was Plaintiff's treating psychiatrist, and this Court believes

that if the Commissioner found her opinions to be of no or little weight, the

Commissioner must explain his reasons.  Based on the VE's testimony, a person with the

mental limitations assessed by Dr. Jones would not be able to perform Plaintiff's past

office jobs.

Ordinarily, when a reviewing court concludes that a denial of disability benefits

was improper, the court, out of "abundant deference to the ALJ," should remand the case

for further administrative proceedings; remand with instruction to award benefits is

appropriate "only if the record overwhelmingly supports such a finding."  Buckner v.

Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000).  The Court does not believe that there is

overwhelming evidence here that would warrant an order to award benefits.  Rather, upon

review of the entire record, the Court believes that the better course in this case is to

reverse the ALJ's decision and remand the case for reconsideration of Plaintiff's

applications, and for an explanation of the weight to be given the evidence submitted to

the Appeals Council.  See Ford v. Astrue, 518 F.3d 979, 982-83 (8th Cir. 2008)

(reversing and remanding where the ALJ's credibility determination was based in part on

some erroneous inference that he drew from the record, even though the ALJ gave some

good reasons for his credibility determination); See Grogan v. Astrue, No. 1:07CV132

LMB, 2009 WL 877707, at *4, 12-13 (E.D. Mo. March 26, 2009) (reversing ALJ's decision and remanding case for a new RFC determination where the record did not contain an opinion by any physician, other than one discredited by the ALJ, regarding the plaintiff's ability to function in the workplace).

The ALJ is reminded that in reconsidering Plaintiff's RFC, Plaintiff's mental and physical impairments must be considered in combination. See 20 C.F.R. § 404.1523; SSR 96-8p, 1996 WL 374184, at *5 (when assessing an individual's RFC, the ALJ "must consider an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do"); Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED** for further consideration.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 1st day of September, 2010.